IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

JERRY L. MOSS,                          )
                                        )
        Plaintiff,                      )
                                        )
                                        )
vs.                                     )            CV-00-RRA-0492-E
                                        )
                                        )
LEGACY CABINETS, L.L.C.,                )
                                        )
        Defendant.                      )

**ENTERED**
**MAY 0 6 2002**

## MEMORANDUM OF OPINION

This is a Title VII discrimination action. The defendant is a maker of cabinets. The plaintiff, a black man, worked for Legacy as a sander, from July 30, 1997 until December 21, 1998, when he was discharged for an act of violence in the workplace. The complaint contains only one count, within which the plaintiff presents three claims: promotion discrimination, discharge discrimination, and (3) wage discrimination. Before the court is the defendant's motion for summary judgment, in support of which the defendant submitted a brief. The plaintiff filed a brief in response, to which the defendant filed a reply. Both parties submitted summary judgment evidence. The court's ruling will be based strictly on the summary judgment evidence pointed out by the parties and the legal contentions set out in their briefs. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-



80 (6th Cir. 1989); *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986). The summary judgment evidence must be sufficient to support those findings necessary for the plaintiff to prevail, and, of course, the court must view the evidence in the light most favorable to the plaintiff and draw all reasonable inferences against the defendant, the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## Promotion Discrimination Claim

The defendant contends that the plaintiff's promotion claim is due to be dismissed on several grounds.

### Whether the promotion claims are procedurally barred

Before a plaintiff may bring a Title VII action, he first must have filed EEOC charges within one hundred eighty days of the alleged discriminatory act. Legacy states that because the plaintiff filed his EEOC charges on March 10, 1999, he "can state no claim for any alleged promotion he did not receive prior to September 11, 1998." *Defendant's Brief*, p. 11. The defendant also states that the evidence "establishes that the only new hire into the painter position during the period covered by Moss' EEOC charge was Keith Moore. Accordingly, none of the eight instances alleged by Moss occurred during the relevant 180 day period." *Id.* pp. 11-12.

The plaintiff is not claiming that he was discriminated against when Moore was brought in as a painter. Therefore, as the plaintiff does not allege that any instance of promotion discrimination occurred within the one-hundred eighty day period, his promotion claims are procedurally barred. For the purpose of alternative holdings, however, the merits of the plaintiff's promotion claims will be discussed.

The merits of the promotion claims

To prevail on a failure-to-promote claim under Title VII, a plaintiff establishes a prima facie case of race discrimination by showing that: (1) he is a member of a protected minority, (2) he was qualified and applied for the promotion, (3) he was rejected despite his qualifications, and (4) other equally or less qualified employees who are not members of the protected minority were promoted. *Alexander v. Fulton County*, 207 F.3d 1303, 1313 (11th Cir. 2000). Legacy adds that in this case the court also must consider whether, using an objective standard, going from sander to painter would have been a promotion or merely a lateral transfer. *See Doe v. DeKalb County*, 145 F.3d 1441 (11th Cir. 1998).[1]

--------

[1] The plaintiff contends that the defendant is attempting to add another element to what must be established in order to make out a prima facie case of discrimination. It seems, however, that the prima facie test assumes that the position in controversy was a promotion. If there is a dispute about it, the plaintiff must establish that the desired job would have been a promotion for him. *Doe* was an ADA case, but its reasoning seems applicable to Title VII cases. The court stated:

> Of course, in most employment discrimination cases the issue of a plaintiff's subjective preference need not arise, because the plaintiff has alleged an

(continued...)

If a plaintiff makes out a prima facie case of discrimination, it is then incumbent on the employer to state a valid, non-discriminatory reason for its action. If the employer does so, the plaintiff has the burden of pointing to evidence sufficient to support a finding that the reason offered by the defendant is a mere cover-up for the real reason for passing over the plaintiff, his race.

On Legacy's application form, the plaintiff stated that he was applying for work as a painter. Fred Harris, the defendant's personnel manager, testified in his deposition that he might not have even noticed that the plaintiff had written on his application that he was applying for a painter's position. Harris explained that ninety per cent of applicants simply want employment, and that most applicants were hired as laborers unless he, Harris, specified that a person was being hired as a painter. At the time the plaintiff applied for work at Legacy, the defendant did not need more painters, and the plaintiff was not hired as a painter.

After the plaintiff came on board, eleven Legacy employees were made painters. Eight of the eleven were white, and three were black. The eight white persons who were transferred to painter jobs can be divided into three categories: those who had previous

---

[1](...continued)
employment action that would appear adverse to any reasonable person. Where a plaintiff has allegedly suffered termination, demotion, reduction in pay, loss of prestige, or diminishment of responsibilities, for example, a court normally has no cause to consider its standard for adversity; the relevant question in such cases is whether such patently adverse actions actually took place. *Doe*, 145 F.3d at 1448.

painting experience at Welborne, another cabinet maker; those whose identities or qualifications are unknown; and those who painted only on a temporary basis.[2] Also during the time of the plaintiff's employment, Keith Moore was hired in as a painter.[3] The plaintiff claims he was a victim of discrimination in the eight instances white in-house employees were assigned jobs as painters. He does not claim discrimination in Moore's hiring.

Painting needs were filled informally. When another painter was needed, a supervisor would tell Harris, and Harris would hire a painter from outside the company or move a Legacy employee to the paint department. There was no posting of painter jobs. Applications were not taken. Interviews were not conducted. Harris testified that in deciding who would be hired as a painter, or which in-house personnel would be shifted to painter jobs, prior painting experience, especially in painting cabinets, was key. Although the plaintiff was aware of the movement of Legacy employees to painter jobs, he never told anyone with the authority to make him a painter that he wanted to be considered for a painter's job.

*Whether the painter's job would have been a promotion*: The plaintiff has the burden of pointing to evidence from which a comparison of the sanding job and the painting job

---

[2] The plaintiff does not know the names of all of the whites the plaintiff contends became painters.

[3] Moore had worked as a cabinet painter at Welborne Cabinets.

can be undertaken. Without such facts, there is nothing upon which to determine whether this is or is not a *promotion* case. No such evidence has been produced.

*Whether the plaintiff was as qualified as the white employees who were made painters*: In his brief, the plaintiff acknowledges that the defendant's stated reason for selecting the eleven painters was experience. Therefore, the plaintiff must show that his qualifications were at least equal to the qualifications of the white persons who were given jobs as painters.[4] As to his "extensive painting" experience, the plaintiff, in his application, listed among his vocational skills that of "qualified spray painter (automotive finish), house painter," and he stated that at one of his former employers, Energy Absorption Systems, Inc., it was his job "to insure that every thing was painting [sic] that was to be shipped, used arr sanders, drills, high pressure spray gun, regular spray gun, drive two motor (was licensed) supervised a 3 man crew, had to close and shut down plant each night."[5]

The names and experience of the white employees, or the lack thereof, are set out in the defendant's brief:

"Alan": Moss knows nothing about the qualifications of "Alan." (Moss Dep. at 100, 116.) Fred Harris has no idea who "Alan" is. (Harris Aff., ¶ 9.)

---

[4] The plaintiff states that Legacy's "vague criteria [of liking to hire painters from Welborne] makes it impossible for Mr. Moss to compare his extensive painting background with that of the painters hired during the relevant period." *Plaintiff's Brief*, p. 2. The plaintiff has not been limited in showing his qualifications as a painter of cabinets.

[5] The plaintiff did not state that he did the actual painting at Energy Absorption Systems, whatever such painting consisted of.

"Jamie":  Moss claims that Jamie became a painter some time in 1998, but he knows nothing about the qualifications of "Jamie." (Moss Dep. at 100.)  The person Moss refers to as "Jamie" was probably James Irvin. Mr. Irvin was hired about the same time as Mr. Moss, on August 21, 1997. At some point in time, Mr. Irvin did become a painter at Legacy. Mr. Irvin was previously a cabinet painter at Welborne Cabinets. (Harris Aff. ¶ 6.)

"Dennis":  Moss claims that a white person named "Dennis," who allegedly did not know "diddley" about painting, became a painter in the Summer or Fall of 1997. (Moss Dep.  at 102, 111.) Fred Harris has no idea who "Dennis" is.

Dwight Madden: Moss claims that Dwight Madden became a painter in "early 1998" and admits that Madden already had experience as a painter at Legacy Cabinets. Moss has no idea what Madden's rate of pay was. (Moss Dep. at 112-113.)

Ron Denton: Moss testifies that Denton became only a "temporary relief painter" and never actually became a full-time painter. (Moss Dep. at 114-15.) Fred Harris assumes that Moss refers to Ron Dean. (Harris Aff.  ¶ 8.)  Ron Dean was never a painter, but rather worked in the Pump Room.

"Kimberly":  Moss claims that he was passed over in favor of a person named "Kimberly," but admits that "Kimberly" never received a full-time painter's position. (Moss Dep.  at 118-19.) Fred Harris has no idea who "Kimberly" is. (Harris Aff., ¶ 9.)

"Kelly":  Moss claims that "Kelly" became a full-time painter in 1998, but he has no idea of her qualifications or pay. (Moss Dep. at 120.) Fred Harris assumes the person Moss refers to as "Kelly" was probably Kelly Black. (Harris Aff. ¶ 6.) Ms. Black was hired from the outside as a painter on June 4, 1998.  (Id.)  Ms. Black was hired from the outside as a painter on June 4, 1998.  (Id.)  Ms. Black was also a cabinet painter at Welborne Cabinets.  (Id.)

"Tim":  Moss claims that "Tim" became a full time painter in late 1997 or early 1998. (Moss Dep. at 122-23.) Elsewhere, Moss alleges that "Tim" became a painter only about a week after Moss was hired.  (Moss Dep. at 99.)  In any event, Moss knows nothing about "Tim's" qualifications or pay. (Moss Dep. at 122-23.) Fred Harris has no idea who "Tim" is. (Harris Aff., ¶ 9.)

*Defendant's Brief*, pp. 3-4.

Of the eight whites the plaintiff asserts were made painters during his time at Legacy, one was a temporary relief painter, another never became a full-time painter, and three have not been identified by the plaintiff or the defendant. Removing those five persons from the list of eight leaves remaining three white painters, all of whom had prior experience painting *cabinets*, which was a qualification the plaintiff did not possess. It certainly seems that preferring an employee who had prior experience painting cabinets, for the job of painting cabinets, over an employee who did not have experience painting cabinets, was a valid consideration. In any event, Harris testified that, in his mind, cabinet-painting experience was desirable, and there is no evidence which suggests that this explanation for his selections is pretextual. Also, it is noted that, excluding the temporary painters and the white painters whose existence or qualifications are not before the court, three of the employees sent to the paint department were white, and three were black. In other words, the number of black persons made painters and the number of white persons made painters was the same.

*Whether the plaintiff applied for the painter jobs in question*: The plaintiff asserts that his having written on his application that he was applying for a job as a painter is tantamount to "applying" for a painter's job every time a supervisor told Harris that another painter was needed. In the opinion of the court, such reliance is insufficient as a matter of law. The plaintiff had the opportunity to ask to be made a painter when he saw other employees being assigned painting jobs, but he chose not to speak up or take

-8-

any action which would have communicated to a supervisor or Harris his desire to become a painter.[6]

### Plaintiff's Discharge For Violence

The plaintiff got into an altercation with a black female, Gail Hutchinson, and he was discharged for it. The plaintiff contends that other employees had gotten into physical altercations and were not fired. The plaintiff states that it is for a jury to determine "if the plaintiff's incident is sufficiently dissimilar to other physical altercations to warrant placing it in a separate category of conduct." *Plaintiff's Brief*, p. 3. The plaintiff states that the defendant's lack of a reporting system for violence between employees "can be an open invitation for the supervisors to selectively report acts of violence. Therefore, the personnel records of employees may not reflect incidents of physical violence between employees. Particularly when the selective reporting is based upon race." *Id.* In support of the assertion that white employees were involved in physical violence and not discharged, the plaintiff has submitted the affidavits of Shea O'Neal, Tracy Nunn, and Dewitt Sheppard.

---

[6]The plaintiff cites a case which deals with a "word-of-mouth" system of learning about and seeking promotions, *United States v. Georgia Power Company*, 474 F.2d 906 (5th Cir. 1973). Such a system was not used in Legacy, for Harris simply moved persons around to fill painting needs. The plaintiff is not challenging this method of selecting painters as having a discriminatory effect on black employees.

In her affidavit, O'Neal states that she saw Casey Nunn twist the arm of his ex-wife, Tracey Nunn. The plaintiff testified that he watched these two employees push and shove each other. O'Neal also stated that she saw employees Vanderslice and Gunn "get into it." This vague statement is of little, if any, evidentiary value.[7] Though Nunn speaks of the Vanderslice-Gunn run-in, she was not on the scene until it was over. Sheppard states in his affidavit that Joe Garrett, a black male, and Audie Hallman, a white male, were fighting in 1997 or 1998; only Garrett was discharged as a result. The plaintiff testified to shoving incidents between Tammy Abbott and a co-worker named Shirley, which the plaintiff described as "maybe a small shove but no hitting," and no one was fired. *Plaintiff's Deposition*, p. 194. The plaintiff is not aware of an incident, other than his own, where a male pushed a female to the floor.

As the plaintiff states, the defendant contends that the altercation between the plaintiff and Gail Hutchinson was of a different character than the altercations pointed out by the plaintiff as comparators. Plaintiff Moss was six feet, three finches tall and weighed two-hundred twenty pounds, while Hutchinson stood five feet, seven inches tall and weighed one-hundred seventy pounds. In his deposition, Moss states that Hutchinson came to his work station and began "using verbal abuse on" him. *Plaintiff's Deposition*, p. 144. Moss then shoved Hutchinson, who was working on an elevated platform, and she

---

[7]O'Neal states that Vanderslice was suspended, although in O'Neal's opinion Vanderslice was not at fault. Both Vanderslice and Gunn are white.

-10-

fell off the platform. Hutchinson got up and picked up a door. The plaintiff and Hutchinson were separated just as Hutchinson was about to hit the plaintiff over the head. The plaintiff admitted that Hutchinson could have been injured from the fall off the platform.

The defendant also states that many employees, both white and black, were fired for fighting. To the best of his knowledge, everyone who had engaged in any kind of physical violence at Legacy was fired. (Harris testified that he did not recall reports of fighting involving Casey or Tracey Nunn or Tammy Abbott.) Harris testified that Keith Moore, Randy Pettis, Benjamin Abbott, and Robert Thomas, all white, were fired for fighting. Harris also named several black employees who were terminated for fighting.

It is concluded that the incidents described by the plaintiff are different in kind from the plaintiff's shoving Hutchinson off the platform. Additionally, there is insufficient evidence before the court to support a finding that persons who had engaged in violent acts at the workplace were treated differently based on their race; in fact, the evidence shows that race was not a consideration.

## Pay Discrimination

Because the plaintiff has not responded to the defendant's argument that the pay discrimination claim should be dismissed, it is deemed that the plaintiff concedes that the defendant is due summary judgment on this claim.

## Conclusion

Wherefore, the defendant's motion for summary judgment is due to be granted as to all claims and the complaint dismissed with prejudice.  An order in accordance with this memorandum of opinion will be entered.

DATED this 6 th day of May, 2002.

Robert R. Armstrong, Jr.
United States Magistrate Judge